MARSHALL GERSTEIN & BORUN LLP
BRADFORD P. LYERLA (*pro hac vice*)
KEVIN D. HOGG (*pro hac vice*)
JEFFREY H. DEAN (*pro hac vice*)
GREGORY STANTON (*pro hac vice*)
ANDREW RAYMOND (*pro hac vice*)
6300 Sears Tower
Chicago, Illinois 60606
(312) 474-6300 (telephone)
(312) 474-0448 (telecopier)
blyerla@marshallip.com
khogg@marshallip.com
jdean@marshallip.com
gstanton@marshallip.com
araymond@marshallip.com

COUNSEL FOR DEFENDANT CHARTER
COMMUNICATIONS, INC. AND 12 ADDITIONAL
CABLE TELEVISION DEFENDANTS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| ACACIA MEDIA TECHNOLOGIES CORPORATION,<br><br>Plaintiff,<br><br>- vs. -<br><br>NEW DESTINY INTERNET GROUP, *et al.*,<br><br>Defendants. | Case No. C 05-01114 JW (HRL)<br><br>MDL NO. 1665<br><br>**MEMORANDUM OF LAW AND FACT IN SUPPORT OF RECONSIDERATION OF THE COURT'S CONSTRUCTION OF THE TERM "REMOTE LOCATIONS"** |
| AND ALL RELATED AND/OR CONSOLIDATED CASE ACTIONS |  |

Dockets.Justia.com

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    A.    Claim 41 of the '992 Patent ......................................................................... 3

    B.    The Court's Construction ............................................................................. 4

    C.    The Applicants' Own Construction .............................................................. 5

        1.    Application Claim 33 of the '720 Patent ......................................... 5

        2.    "Remote From the Requesting Site"—Part I ................................... 7

        3.    "Remote From the Requesting Site"—Part II .................................. 8

ARGUMENT ....................................................................................................................... 9

    I.    THE *MICROSOFT* DECISION EMPOWERS THE
COURT TO CONSIDER THE PROSECUTION HISTORY
OF THE '720 PATENT IN CONSTRUING THE TERM
"REMOTE LOCATIONS" IN ANCESTRAL PATENTS ..................... 9

    II.    THE PROSECUTION HISTORY OF THE '720 PATENT
IS CONSISTENT WITH ALL OTHER RECORD EVIDENCE ..................... 17

        A.    The Claim Language ................................................................... 18

        B.    The Common Specification ......................................................... 19

        C.    The Prosecution History of the '992 Patent ............................... 22

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

*Cases:*                                                                  *Page(s)*

*Biovail Corp. Int'l v. Andrx Pharms., Inc.,*
    239 F.3d 1297 (Fed. Cir. 2001) ............................................................. 18

*In re Bode*
    550 F.2d 656 (CCPA 1977) ................................................................... 15

*Chimie v. PPG Indus.,*
    402 F.3d 1371 (Fed. Cir. 2005) ............................................................. 18

*In re Columbia Univ. Patent Litig.*
    330 F. Supp. 2d 18 (D. Mass. 2004) ...................................................... 11

*Desper Prods., Inc. v. QSound Labs, Inc.,*
    157 F.3d 1325 (Fed. Cir. 1998) ............................................................. 17

*Digital Biometrics v. Identix, Inc.,*
    149 F.3d 1335 (Fed. Cir. 1998) ............................................................. 24

*Ekchian v. Home Depot, Inc.,*
    104 F.3d 1299 (Fed. Cir. 1997) ............................................................. 21

*Elkay Mfg. Co. v. Ebco Mfg. Co.,*
    192 F.3d 973 (Fed. Cir. 1999) ............................................................... 12

*Georgia-Pacific Corp. v. United States Gypsum Co.,*
    195 F.3d 1322 (Fed. Cir. 1999) ........................................................ 11, 15

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l,*
    222 F.3d 951 (Fed. Cir. 2000) ............................................................... 18

*Jonsson v. Stanley Works,*
    903 F.2d 812 (Fed. Cir. 1990) ............................................................... 12

*Laitram Corp. v. Morehouse Industries, Inc.,*
    143 F.3d 1456 (Fed. Cir. 1998) ........................................................ 12, 16

*Microsoft Corp. v. Multi-tech Sys., Inc.,*
    357 F.3d 1340 (Fed. Cir. 2004) ........................................................ *passim*

*Modine Mfg. Co. v. ITC,*
    93 F.3d 766 (Fed. Cir. 1996) ................................................................. 21

*Nikon Corp. v. ASM Litho. B.V.,*
    308 F. Supp. 2d 1039 (N.D. Cal. 2004) .................................................. 11

*Phillips v. AWH Corp.,*
    __ F.3d __, 2005 WL 1620331 (Fed. Cir. July 12, 2005) ................... 1, 18, 22

- ii -

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001) ........................................................................ 18, 21

*Seachange Int'l, Inc. v. C-Cor, Inc.*,
   __ F.3d __, 2005 WL 1523382 (Fed. Cir. June 29, 2005) ....................... 16, 18, 23, 24

*Signtech USA, Ltd. v. Vutek, Inc.*,
   174 F.3d 1352 (Fed. Cir. 1999) .................................................................................... 21

*Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*,
   74 F.3d 1216 (Fed. Cir. 1996) ..................................................................................... 21

*Southwall Tech., v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ............................................................................. 18, 24

*Texas Digital Sys., Inc. v. Telegenix, Inc.*,
   308 F.3d 1193 (Fed. Cir. 2002) ............................................................................. 21-22

*Tronzo v. Biomet, Inc.*,
   156 F.3d 1154 (Fed. Cir. 1998) .................................................................................... 21

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
   141 F.3d 1084, 1090-92 (Fed. Cir. 1998) .................................................................... 21

*Statutes:*

35 U.S.C. § 102 ................................................................................................. 7, 15, 16

35 U.S.C. § 112 ........................................................................................................... 15

*Miscellaneous:*

Harmon, Robert L., PATENTS AND THE FEDERAL CIRCUIT 331 (7th ed. 2005) ..................... 11

MPEP § 708.02 .......................................................................................................... 22

- iii -

**INTRODUCTION**

Defendants[1] respectfully urge reconsideration of the Court's construction of the term "remote locations" in claim 41 of Acacia's '992 patent. That term was expressly defined more narrowly in unusually clear and unambiguous remarks to the United States Patent and Trademark Office ("PTO") by applicants Yurt and Browne during the prosecution of their related '720 patent. Those remarks would, by all accounts, be controlling had they been uttered during the prosecution of the '992 patent. Because, however, they were uttered during the subsequent prosecution of the '720 patent, the Court declined to consider them.

Defendants respectfully submit that this was error. Inventor statements to the PTO expressly defining the scope of an invention in any related patent are "always relevant," *Microsoft Corp. v. Multi-tech Sys., Inc.,* 357 F.3d 1340, 1348-49 (Fed. Cir. 2004), especially where, as here, those statements define common *claim terms.* Here, applicants Yurt and Browne told the PTO—under circumstances imposing obligations of candor and demanding precision—that the term "remote locations" means and *always* meant locations "remote from the requesting site." Under the reasoning of *Microsoft*, the Court should not have assigned those same terms different meanings.

The remaining evidence of record leads to the same conclusion, particularly in light of the Federal Circuit's recent *en banc* decision in *Phillips v. AWH Corp.*, __ F.3d __, 2005 WL 1620331 (Fed. Cir. July 12, 2005), in which the court of appeals refocused the task of claim construction *away* from the "ordinary" meaning of words in a vacuum or as defined in particular dictionaries and *towards* the way words are actually used in context by inventors in

---

[1] The following defendants join in this motion: Armstrong Group, Inc., Arvig Communications Systems, Inc., Block Communications, Inc., Cable America Corp., Cable One, Inc., Cannon Valley Communications, Inc., Cequel III Communications I, LLC (d/b/a Cebridge Connections), Charter Communications, Inc., Comcast Corporation, Coxcom, Inc., DirecTV Group, Inc., East Cleveland TV and Communications LLC, Hospitality Network, Inc., Loretel Cablevision, Massillon Cable TV, Inc., Mediacom Communications Corporation, Mid Continent Media, Inc., NPG Cable, Inc., Sjoberg Cablevision, Inc., U.S. Cable Holdings L.P., and Wide Open West, LLC.

- 1 -

Case No. C 05-01114 JW (HRL)     DEFENDANTS' MOTION FOR RECONSIDERATION OF
MDL NO. 1665                      THE CONSTRUCTION OF THE TERM "REMOTE LOCATIONS"

the intrinsic record on which the public is entitled to rely. Here, the common specification and the contemporaneous prosecution history of the `992 patent consistently describe *the* invention—not merely one embodiment thereof—as a system which permits a user to receive information at a location other than where the user accesses the system. In some instances, the user can also *select* between and among several such locations. But in *all* instances—whether *selectable* or not—the user need not be physically present at a receiving location in order to access the system and make a request.

Importantly, this construction of the term "remote locations"—*i.e.*, locations "remote from the requesting site"—was never argued to the Court in prior briefing. To the contrary, the New Destiny Defendants argued that the term "remote locations" means "more than one location *selected* by the user." The Court, however, rejected that construction in large measure based on the doctrine of claim differentiation, observing that other claims of the `992 patent—*e.g.*, claims 19 and 47—recite "selected" remote locations expressly. By contrast, the doctrine of claim differentiation does not arguably apply to the construction proposed here. A location can be "remote from the requesting site" *without* also being "selectable," and thus construing the term "remote locations" to mean locations "remote from the requesting site" avoids all of the claim differentiation concerns on which the Court heavily relied in its prior *Markman* order.

For these reasons, as set forth more fully below, defendants respectfully urge reconsideration of the term "remote locations," and urge the Court to construe that term as applicants Yurt and Browne defined it before the PTO—namely, "a location remote from the requesting site."

## BACKGROUND

Acacia asserts more than 70 claims from five U.S. patents against nearly 50 defendants representing three major sectors of the American telecommunications industry: (1) the Internet, (2) cable television, and (3) satellite television. Each patent is entitled "Audio and

Video Transmission and Receiving System," shares a common specification, and claims priority from the same initial patent application filed in January 1991. (*Compare generally* Exs. A-E.)[2] Messers. Paul Yurt and H. Lee Browne are named as co-inventors on all five patents. (*Id.*)

More than 20 of the asserted claims recite the transmission of information to "remote locations." In all but two of those claims, the remote locations to which information is transmitted are selectable by the end user.[3] The two exceptions—claims 1 and 41 of the '992 patent—recite the transmission of information to "remote locations" without similar modification. (Ex. A, '992 patent, col. 20, lns. 14-40; col. 24, ln. 54 – col. 25, ln. 5.)

Claim 1 of the '992 patent is not presently asserted against the moving defendants. This motion, therefore, concerns claim 41 of the '992 patent only.

## A.    Claim 41 of the '992 Patent

Claim 41 of the '992 Patent is set forth below with the term "remote locations" high-

---

[2] The five Acacia patents-in-suit, together with their issue dates, are as follows: U.S. Patent No. 5,132,992 (issued July 21, 1992); U.S. Patent No. 5,253,275 (issued October 12, 1993); U.S. Patent No. 5,550,863 (issued August 27, 1996); U.S. Patent No. 6,002,720 (issued December 14, 1999); U.S. Patent No. 6,144,702 (issued November 7, 2000).

[3] For example, independent claim 19 of the '992 patent recites the transmission of information "to the one of the receiving systems at one of the remote location [*sic*] selected by the user" (Ex. A, '992 Patent, col. 22., lns. 37-39), and sending, receiving, and storing information at "the selected remote location" (*id.*, col. 2, lns. 43-50). Independent claim 47 of the '992 patent recites means for the transmission of information "to the receiving system at one of the remote locations selected by the user" (*id.*, col. 25, lns. 47-48), and transmission means for transmitting information "to the receiving system at the selected remote location" (*id.*, col. 25, lns. 51-52). Independent claim 2 of the '275 patent recites sending a request for information to be transmitted "to a receiving system at one of the remote locations selected by the user" (Ex. B, '275 patent, col. 20, lns. 60-61), and playing back stored information at the "selected remote location" (*id.*, col. 21, ln. 3). Independent claim 5 of the '275 patent recites sending a request for information to be transmitted to "one of the remote locations selected by the user" (*id.*, col. 22, lns. 10-11), and playing back a stored copy of the information "at the selected remote location" (*id.*, col. 22, lns. 21-22). Independent claim 1 of the 720 patent recites the transmission of information to a "premises selected by the user, wherein the premises selected by the user is not limited to a predetermined user premises." (Ex. D, '720 patent, col. 19, lns. 34-36.) Independent claims 4, 8 and 11 of the '720 patent recite the transmission of information to (or the receipt of information by) "a plurality of subscriber selectable receiving stations." (*Id.*, col. 19, lns. 44-45; col. 20, lns. 36-42; col. 21, ln. 3 -  col. 22, ln. 4.)

- 3 -

lighted in bold text:

> A method of transmitting information to **remote locations**, the transmission method comprising the steps, performed by a transmission system, of:
>
> storing items having information in a source material library; retrieving the information in the items from the source material library;
>
> assigning a unique identification code to the retrieved information;
> placing the retrieved information into a predetermined format as formatted data;
>
> placing the formatted data into a sequence of addressable data blocks;
>
> compressing the formatted and sequenced data blocks;
> storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code; and
>
> sending at least a portion of the file to one of the **remote locations**.

(Ex. A, '992 patent, col. 24, ln. 54 – col. 25, ln. 5.)  As is apparent, although information is "sent" or "transmitted" to "remote locations," the claim does not recite—at least not *expressly*—the place from which a location is "remote."

## B.    The Court's Construction

The Court construed the term "remote locations" in claim 41 to mean "positions or sites distant in space from the transmission system."  (Ex. F, *Markman* Order, July 12, 2004, p. 4.)  The Court grounded this construction primarily on a reading of the claim language itself, concluding that (1) the ordinary meaning of the term "remote locations" is "positions or sites distant in space from some identified place," and (2) the only potential place identified by the claim from which a location could be "remote" is the transmission system.  (*Id.*, p. 4.)[4]

---

[4] The Court rejected the alternative construction proposed by the New Destiny Defendants—*i.e.*, "more than one location *selected* by the user"—on the ground that it ran afoul of the doctrine of claim differentiation because independent claims 19 and 47 of the '992 patent recite "selected" remote locations expressly.  (*Id.*, p. 5.)  Again, that portion of the Court's reasoning is inapplicable to the construction urged here—*i.e.*, "a location remote from the requesting site."

DEFENDANTS' MOTION FOR RECONSIDERATION OF
THE CONSTRUCTION OF THE TERM "REMOTE LOCATIONS"

In so holding, however, the Court concluded that it was without power to consider, and thus dismissed, the remarks of applicants Yurt and Browne during the prosecution of the '720 patent. (*Id.*, pp. 6-7.)

## C. The Applicants' Own Construction

The '720 patent is the fourth patent to issue in the chain of applications stemming from the '992 patent. (Ex. D, p. 1.) During the prosecution of the '720 patent, applicants Yurt and Browne prosecuted claims that—like claim 41 of the '992 patent—recited a "transmission system" that sends information to "remote locations" without modification. Consequently, the same reasoning on which the Court relied to construe the term "remote locations" in claim 41 of the '992 patent would have applied with equal force to these application claims in the prosecution of the '720 patent. But applicants Yurt and Browne forcefully and repeatedly argued otherwise, stating in clear and unambiguous remarks that the term "remote locations"—*by itself*—means and *always* meant locations "remote from the requesting site."

### 1. Application Claim 33 of the '720 Patent

Original application claim 33 of the '720 patent recited the transmission of information to "remote locations" without also stating that the "remote locations" were remote from the requesting site, much less selectable by users. In fact, the terms "user" and "request" were nowhere mentioned in the claim. Original application claim 33 is provided below with the term "remote locations" highlighted in bold text:

> 33. (new) A transmission system for providing information to be transmitted to **remote locations**, the transmission system comprising:
>
> a plurality of electronically connected library means for storing items containing information;
>
> identification encoding means for retrieving the information in the items from the plurality of library means and for assigning a unique identification code to the retrieved information;
>
> conversion means, coupled to the identification encoding

means, for placing the retrieved information into a predetermined format as formatted data; and

> transmitter means, coupled to the conversion means, for transmission of the formatted data **to one of the remote locations**.

(Ex. G, p. DTV/AMT 001736.)

The similarity between original application claim 33 of the '720 patent and asserted claim 41 of the '992 patent is important. In both claims, information is transmitted to "remote locations" without further explanation. In both claims, the only "identified place" from which a location potentially could be remote is the "transmission system." And neither claim mentions a "requesting site," much less a "user." Below is a side-by-side comparison of both claims with the terms "remote locations" and "transmission system" highlighted in bold text:

| Claim 41 of the '992 Patent | Application Claim 33 of the '720 Patent |
|---|---|
| A method of transmitting information to **remote locations,** the transmission method comprising the steps, performed by **a transmission system**, of: | A **transmission system** for providing information to be transmitted to **remote locations**, the **transmission system** comprising: |
| storing items having information in a source material library; | a plurality of electronically connected library means for storing items containing information; |
| retrieving the information in the items from the source material library; | identification encoding means for retrieving the information in the items from the plurality of library means and for assigning a unique identification code to the retrieved information; |
| assigning a unique identification code to the retrieved information; | |
| placing the retrieved information into a predetermined format as formatted data; | conversion means, coupled to the identification encoding means, for placing the retrieved information into a predetermined format as formatted data; and |
| placing the formatted data into a sequence of addressable data blocks; | |
| compressing the formatted and sequenced data blocks; | transmitter means, coupled to the conversion means, for transmission of the formatted data to **one of the remote locations.** |
| storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code; and | |
| sending at least a portion of the file to **one of the remote locations.** | |

As is apparent, both claims use the term "remote locations" in identical ways. Consequently, any express definition of the term provided by applicants Yurt and Browne with respect to application claim 33 would be highly probative of what the applicants understood the *same* term—used in the *same* way—to mean in asserted claim 41 of the '992 patent.

## 2. "Remote From the Requesting Site"—Part I

The examiner rejected application claim 33 under 35 U.S.C. § 102(e) as anticipated by U.S. Patent No. 5,195,092 to Wilson. (Ex. G, p. DTV/AMT 001786.) The Wilson patent discloses a video-on-demand virtual shopping mall where subscribers use their residential telephone touchtone key pads to request the transmission of specific audio and visual information to their television sets. (Ex. H, *passim*.) According to the examiner, Wilson also discloses a "transmission system for providing information to be transmitted to *remote locations*." (Ex. G, p. DTV/AMT 001786) (emphasis added).)

Applicants Yurt and Browne disagreed, arguing that Wilson is "significantly different" from "the present invention" because Wilson requires the subscriber to be physically present at the location to which information is transmitted, and that, by contrast, "the present invention" permits the user to request the transmission of information to a site *remote from the requesting site*:

> In the Office Action, the Examiner rejected claim[] 33 . . . under 35 U.S.C. § 102(e) as anticipated by U.S. Patent No. 5,195,092 issued to *Wilson et al.* . . .
>
> *Wilson et al.* teaches a system *significantly different from the present invention*. . . . [I]in *Wilson et al.* the subscriber is *required to be physically present at the location to which information is transmitted*.
>
> In contrast, the *present invention* provides a flexible system in which a user can *remotely access* information. *That is,* the user can request transmission of information to a site *remote from the requesting site*.

(Ex. G, p. DTV/AMT 001791-92 (emphasis added).)

Application claim 33 was different from Wilson because the Yurt and Browne inven-

tion permits the transmission of information to a location "remote from the requesting site." But application claim 33 recited no such limitation, at least not *expressly*, as the examiner later would note. Rather, the only claim term that arguably *could* have supplied such a limitation was the naked term "remote locations," but to do so the term would need to be assigned a special meaning. Applicants Yurt and Browne would supply this special meaning expressly—and would do so in remarkably clear and unambiguous terms—in response to the examiner's second rejection of application claim 33.

### 3. "Remote From the Requesting Site"—Part II

The examiner again rejected application claim 33, noting that the mere recitation of the term "remote locations," standing alone, does not necessarily mean "a location remote from the requesting site," absent some special meaning assigned to that term:

> Regarding claim[] 33 . . . it is noted that the features upon which applicant relies (*i.e.*, "a flexible system in which a user can remotely access information. *That is, the user can request transmission of information to a site remote from the requesting site . . .*") are *not recited in the rejected claim(s)*. Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims.

(*Id.*, p. DTV/AMT 001799 (second emphasis added).)

But the applicants disagreed once again, and did so forcefully. Solely to advance prosecution, and over their continued objection, applicants Yurt and Browne amended application claim 33 to "clarify" that a "remote location may be different from the accessing location." (Ex. G, p. DTV/AMT 001805.) In so doing, applicants Yurt and Browne argued that this amendment was completely *unnecessary* and *redundant* because, in their view, the mere recitation of the term "remote locations," *by itself*, already meant a location that "is different from the accessing location at which the user is positioned when making the request." The following remarks are an unusually clear example of express lexicography by a patent applicant:

> In the pending Office Action, commenting on the November 21, 1997, Response filed by Applicants, the Examiner con-

- 8 -

tends that Applicants were relying on features not recited in the pending claims to distinguish the claims from *Wilson*. . . . Applicants disagree because the claimed invention has *always recited transmission of data to remote locations*. This feature is neither disclosed nor suggested in *Wilson*, which requires the subscriber to be physically present at the location to which information is transmitted.

> *To advance prosecution* of this application, Applicants have amended independent claim 33 to *clarify* that the remote location to which the information is transmitted is *different from the accessing location at which the user is positioned when making the request*. As detailed above, this limitation of claim 33 is not disclosed in or suggested by *Wilson*. For at least this reason, independent claim 33 . . . [is] patentable over *Wilson*.

(*Id.*, p. DTV/AMT 001809 (emphasis added).) Put simply, applicants Yurt and Browne told the public that the term "remote locations," *by itself*, means—and *always* meant—locations "remote from the accessing location at which the user is positioned when making the request," and amending claim 33 to say so expressly was simply redundant, completely unnecessary, and done solely to "clarify" the term for the benefit of the examiner and to "advance prosecution."

The foregoing remarks are the very definition of clear and unambiguous acts of lexicography. Were they uttered during the prosecution of the '992 patent, it is undisputed that the task of claim construction would be at an end. Because, however, they were uttered during the subsequent prosecution of the '720 patent, the Court believed that it was not empowered to consider them. As discussed below, that conclusion was erroneous, and the Court should have construed the term "remote locations" consistent with how applicants Yurt and Browne defined that term before the PTO.

## ARGUMENT

### I. THE *MICROSOFT* DECISION EMPOWERS THE COURT TO CONSIDER THE PROSECUTION HISTORY OF THE '720 PATENT IN CONSTRUING THE TERM "REMOTE LOCATIONS" IN ANCESTRAL PATENTS.

A patent applicant's statements expressly defining an invention before the PTO are

- 9 -

*always* relevant to the construction of common subject matter in *any* related patent. *Micro-soft Corp. v. Multi-Tech Sys., Inc.,* 357 F.3d 1340, 1348-49 (Fed. Cir. 2004). This is especially true where, as here, a patent applicant defines specific *claim terms* that are recited in ancestral patents.

In *Microsoft*, the plaintiff asserted a family of three patents directed to the simultaneous transmission and reception of voice and computer data. Infringement turned on whether claims reciting "sending," "transmitting," and "receiving" data were limited to the transmission of data over a conventional circuit-switched telephone network or whether the claims could also read on the transmission of data over packet-switched networks such as the Internet.[5] During the prosecution of the second patent—and *after* the first patent had issued—the applicant distinguished two prior art references on the ground that they did not disclose a point-to-point connection over a telephone line. In so doing, the applicant described the "invention" in the common specification of all three patents as disclosing a conventional point-to-point telephone connection.

The Court relied in part on these prosecution statements in construing the terms "sending," "transmitting," and "receiving" in ancestral patent claims to require a point-to-point connection over an ordinary telephone line and to exclude transmission of information over the Internet. In so holding, the Court explained the rule in terms that apply with equal force here:

> *Any statement* of the patentee in the prosecution of a related application as to the scope of the invention *would be relevant* to claim construction, and the relevance of the statement made in this instance is enhanced by the fact that it was made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention. Accord-

---

[5] A "circuit-switched network," such as the Public Switched Telephone Network, is one in which a connection is established from one user to the other such that the users have exclusive and full use of the circuit until the connection is released. By contrast, a "packet-switched network," such as the Internet, is one in which data packets are relayed through various stations on a network, travel along different paths, and are reassembled at their ultimate destination. *Id.* at 1345 n. 2.

ingly, we conclude that [the applicant's] statements made during the prosecution of the '627 patent with regard to the scope of its inventions as disclosed in the common specification are relevant not only to the '627 and '532 patents, but also to the *earlier issued* '649 patent.

*Id.* at 1350 (emphasis added). *See also Nikon Corp. v. ASM Litho. B.V.*, 308 F. Supp. 2d 1039, 1089 (N.D. Cal. 2004) (Patel, C.J.) ("Any statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction . . . not only to [patents issued *after* the predicate patent], but also to [] *earlier issued* [] patent[s]'") (quoting *Microsoft*) (brackets and emphasis in original); *In re Columbia Univ. Patent Litig.*, 330 F. Supp. 2d 18, 21 (D. Mass. 2004) ("[s]ince the [subsequent] application is part of the same family of patents as the '275 patent and *contains some identical claim language*, statements that Columbia has made and will make during the prosecution of the [subsequent] application are *directly relevant* to the claim construction of the '275 patent) (emphasis added); Robert L. Harmon, PATENTS AND THE FEDERAL CIRCUIT 331 (7th ed. 2005) ("The prosecution history of one patent is relevant to an understanding of the scope of a *common term* in a second patent stemming from the same parent application, *even where the second patent had already issued*") (citing *Microsoft*) (emphasis added).

This Court, however, declined to apply the rule of *Microsoft* on two grounds. First, the Court concluded that *Microsoft* applies solely to statements about a common *specification*, and not to statements about common *claim terms*. (Ex. F, p. 7.) Second, the Court concluded that the rule of *Microsoft* does not apply to statements made in the course of amending claims to overcome art that would not have been prior art to an earlier application, citing *Georgia-Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322 (Fed. Cir. 1999). Defendants respectfully submit that *Microsoft* stands for neither proposition.

First, nothing in the holding or the reasoning of *Microsoft* limits its reach to statements about a common specification. It is certainly true that the prosecution statements on which the *Microsoft* majority relied were directed to the "invention" disclosed in the common specification as opposed to specific claim terms shared with the ancestral patent. But

- 11 -

that fact counsels in *favor*, not *against*, the application of the rule of *Microsoft* in this case. Whereas *Microsoft* involved the *indirect* construction of common claim terms based on statements about a common specification, this case involves the *direct* definition of common claim terms themselves. It would be anomalous to hold that prosecution statements discussing a common *specification* are relevant to the construction of common claim terms, but that statements *directly defining common claim terms themselves* are to be ignored. Nothing in the holding or reasoning of *Microsoft* suggests, much less compels, such an anomalous result. The very cases on which the *Microsoft* court relied are illustrative.[6]

Second, *Microsoft* never held that statements made in the course of overcoming prior art are somehow irrelevant to the construction of ancestral patent claims. To the contrary, the prosecution statements on which the majority expressly relied were made in an effort to distinguish two prior art references cited in an examiner's rejection. 357 F.3d at 1349. Confusion arises, however, from a single footnote where the majority responds to Judge Rader's dissenting opinion by distinguishing between statements and amendments directed "more specifically" to features of newly cited art (on which the majority did *not* rely) and statements defining *common subject matter shared with the ancestral patent* (on which the majority *did* rely):

> During prosecution of the [second] patent, Multi-Tech went on to distinguish Lewen, which discloses the use of a token-ring local area network ("LAN") to transmit voice, data, and image information, by explaining that "[i]n contrast, Applicants' voice packets do not circulate around a LAN but proceed *directly* from the communications system through the [telephone] line to

---

[6] *See Laitram Corp. v. Morehouse Industries, Inc.,* 143 F.3d 1456, 1460 n.2 (Fed. Cir. 1998) (relying on prosecution statements to construe common claim terms in a sibling patent, and stating "when two patents using the *same claim term* both stem from the same parent patent application, the prosecution histories of *both* are relevant to an understanding of the term in *both* patents") (emphasis added); *Jonsson v. Stanley Works,* 903 F.2d 812, 817-18 (Fed. Cir. 1990) (holding that statements made about a *common claim term* in distinguishing prior art were relevant to the construction of that term in a related patent); *Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 978-80 (Fed. Cir. 1999) (statements that were explicitly about a common term *as it occurred in the claim,* not in the specification, and which were made to distinguish prior art were relevant in construing the common term in a related patent).

> a receiving communications system at the other end of the line." (emphasis added). Multi-Tech further distinguished the Arbel reference on the basis that it does not disclose the transmission of packetized voice data "across" or "over" a POTS line. *Those statements add further credence to our claim interpretation.* However, because they refer *more specifically* to the references cited against the claims of the '627 patent only, we limit their relevance to our interpretation of the '627 patent. Moreover, the prosecution history statements that we rely on were made by Multi-Tech in May 1997 and relate to the communications system disclosed in the common specification. We do not, as the dissent suggests, rely on the November 1997 "modem" *amendment*, which applies only to the '627 patent.

357 F. 3d at 1349 n. 5 (first emphasis in original). A careful reading of this footnote, together with an analysis of the underlying facts about which it speaks, demonstrates that the *Microsoft* majority never intended to render irrelevant prosecution statements that expressly refer to *common subject matter* simply because they are made in connection with *other* remarks and amendments that refer to specific features of newly cited art.

Specifically, during the prosecution of the '627 patent—the second of the three patent-in-suit to issue in the *Microsoft* case—the examiner rejected the application claims as obvious in light of two prior art references named Lewen and Arbel, respectively. Multi-Tech disagreed, and in a single response dated May 9, 1997 (1) provided a summary of the invention as disclosed in the common specification *and* (2) discussed specific features of the Lewen and Arbel references. Both remarks emphasized that the Multi-Tech invention used an ordinary telephone line, not the Internet. The examiner, however, was not persuaded that the mere recitation of the terms "transmitting," "sending" and "receiving," *by themselves*, limited the claims to ordinary telephone lines. And so in November of the same year, Multi-Tech *amended* the claims to recite the use of a "modem," after which the examiner allowed the claims. The dissent, however, criticized the majority for relying on this "'modem' amendment" to construe ancestral claims that were never so amended, much less amended in response to the newly cited art.

Footnote 5 of the *Microsoft* decision must be read in this context. The majority emphasized that "[w]e do not, as the dissent suggests, rely on the November 1997 'modem'

- 13 -

amendment, which applies only to the '627 patent."[7]  The majority also declined to rely on

certain remarks that "refer *more specifically* to the references cited," although nowhere does

the majority say that it was *prevented* from so relying—especially where the majority went

out of its way to acknowledge that these very statements added "further credence" to its

claim construction.  Rather, the majority was simply careful to distinguish between remarks

that are directed specifically—or "more specifically"—to issues that are *unique* to newly

cited art, on the one hand, and remarks that on their face refer to subject matter that is shared

in *common* with ancestral patents, on the other hand.  Any contrary reading of footnote 5

would run afoul of the principal holding of *Microsoft*, *i.e.*, that "*any* statement" of the pat-

entee in the prosecution of a related application as to the scope of the invention "would be

relevant" to claim construction.  *Id.* at 1350 (emphasis added).

Here, as in *Microsoft,* the applicants responded to the examiner's rejection of pending

claims by *both* (1) discussing the meaning of subject matter *shared in common* with ancestral

patents *and* (2) discussing more specific aspects of the particular art cited against the pending

claims.  Here, as in *Microsoft,* the examiner was unpersuaded that the meaning of the *origi-

nal*, *unamended, common claim terms* meant what the applicants said they meant.  Here, as

in *Microsoft,* the applicants then amended the application claims to recite expressly what the

applicants earlier had argued the *unamended claims already meant.*  And here, as in *Micro-

soft*, there is no need to rely on the *amendment* to the application claims, much less the spe-

cific comments directed specifically to the newly cited art, in *any* respect.  Rather, defen-

dants here rely solely on the applicants' argument that amending the application claim was

*redundant* and *unnecessary* because the *unamended* claim already conveyed the meaning

supplied by the later amendment.  Just as in *Microsoft*, this Court is empowered to distin-

---

[7] Nor do defendants here rely on any actual *amendments* to application claim 33 in any respect.  Rather, defendants rely solely on the applicants' *statements* that amending application claim 33 was redundant and unnecessary because the term "remote locations"—*without amendment*—already meant "remote from the requesting site."

guish between statements about *common subject matter* from statements that "more specifically" relate to the newly cited art and to an amendment to the claims.

For similar reasons, this Court's reliance on *Georgia-Pacific* was also misplaced.  Defendants do not argue here that Acacia is formally *bound* by the prosecution history of the '720 patent, much less by the *amendment* made to application claim 33.  Rather, defendants argue only that the statements made during the prosecution of the '720 patent referred to subject matter—here, a specific claim term—*commonly shared* with the '992 patent, and thus should have been viewed as relevant evidence to be weighed against all other evidence relevant to claim construction.  That was the approach of the majority in *Microsoft*, which distinguished *Georgia-Pacific* on precisely this ground:

> *Georgia-Pacific* is not to the contrary. . . .  We rejected the argument that the patentee was *bound*, or estopped, by a statement made in connection with a later application on which the examiner of the first application could not have relied.  We did not suggest, however, that such a statement of the patentee as to the scope of the disclosed invention would be *irrelevant*.

357 F.3d at 1350 (emphasis added).[8]

---

[8] The Court's reliance on *Georgia-Pacific* was also predicated on an incorrect factual assumption—namely, that the Wilson reference was "1993 prior art." (Ex. F, p. 7).  Wilson was not "1993 prior art," at least not under the statutory provision cited by the examiner.  To the contrary, the examiner cited Wilson under 35 U.S.C. §102(e) (Ex. G, p. DMV/AMT 001786), which looks not to the *issue date* of a patent, but rather to the *filing* date of its application.  35 U.S.C. § 102(e) (a person is entitled to a patent "unless the patent was described in . . . a patent granted on an *application* for patent by another *filed* in the United States before the invention by the applicant for patent").  Moreover, a patent's filing date for purposes of 102(e) is not necessarily the date of the particular application that matured into the issued patent, but rather the filing date of the *first* application in a chain which contained the relevant disclosure.  *See, e.g., In re Bode*, 550 F.2d 656, 659-60 (CCPA 1977) ("The question is whether the Bitzer patent anticipates appellants' claimed invention, notwithstanding that appellants have established a date of invention prior to the actual filing date of the application that matured into the Bitzer patent.  The answer depends on whether the Bitzer *parent* application contained an enabling disclosure (35 U.S.C. § 112, first paragraph) of the subject matter of the appealed claims that was carried over to the Bitzer patent, so that the *parent's* filing date is the effective date of the Bitzer patent as a reference under 35 U.S.C. § 102(e)").  Here, the Wilson patent issued from a chain of continuation applications—thus containing the *identical* disclosure—going back to November 14, 1988 (Ex. H, p. 1), which is long before the invention date of the very first application filed in the chain of Acacia patents.  Wilson, therefore, is prior art under 102(e) not only to the '720 patent, but to the '992 patent as well.

1   Acacia's sole response, in prior briefing, to the rule of *Microsoft* was that the exam-

2   iner disagreed with the arguments of applicants Yurt and Browne, and thus rejected the view

3   that the term "remote locations," *by itself*, meant a location "remote from the requesting

4   site." But that argument was also made, and rejected, in *Microsoft*, where the examiner dis-

5   agreed with the applicant's argument that the terms "sending," "transmitting" and "receiv-

6   ing," *by themselves*, meant a point-to-point connection over a telephone line, thus necessitat-

7   ing the November amendment which recited a "modem" expressly. As the *Mircosoft* major-

8   ity explained, such prosecution arguments are not rendered irrelevant simply because they

9   were not relied upon or agreed to by the examiner. 357 F.3d at 1350 ("We have stated on

10  numerous occasions that a patentee's statements during prosecution, whether relied on by the

11  examiner or not, are relevant to claim interpretation). *See also Seachange Int'l, Inc. v. C-*

12  *Cor, Inc.*, __ F.3d __, 2005 WL 1523382 (Fed. Cir. June 29, 2005) ("The fact that the Exam-

13  iner did not indicate reliance on the [applicant's statements] is of no consequence. An appli-

14  cant's argument made during prosecution may lead to a disavowal of claim scope even if the

15  Examiner did not rely on the argument"); *Laitram Corp.*, 143 F.3d at 1462 ("The fact that an

16  examiner placed no reliance on an applicant's statement distinguishing prior art does not

17  mean that the statement is inconsequential for purposes of claim construction"). Finally, the

18  fact that application claim 33 was amended further after these arguments were made is also

19  irrelevant, as the Federal Circuit has explained under similar circumstances:

20          [Plaintiff] further argues that the attorney's remarks should not be
            used to interpret the claim language because the amendment that
21          precipitated the remarks did not end the prosecution. In effect,
            [plaintiff] argues that the remarks were inconsequential because
22          they did not result in allowance of the claims. . . . What [plain-
            tiff] fails to acknowledge, however, is that the amendment and
23          accompanying remarks were made for the purpose of overcom-
            ing the outstanding rejection based on the [cited art]. That the
24          prosecution shifted to a different focus does not blunt the impact
            of those remarks made to overcome the prior rejection. The sig-
25          nificance of the remarks in this case is no different than in a case
            in which the claims are allowed in response to an amendment.

- 16 -

*Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1335-36 (Fed. Cir. 1998) (emphasis added).

Under the circumstances, the reasoning of *Microsoft* applies to the facts of this case at least as much as—indeed, more than—it applied to the facts of *Microsoft*.  Here, as in *Microsoft*, application claims in a descendent patent shared common claim terms with issued claims in an ancestral patent.  Here, as in *Microsoft*, the applicants argued that amending those very claim terms was unnecessary because the invention—*as already claimed*—implied a special meaning not expressly recited in the claims.  But in *Microsoft*, the applicants never defined the common claim terms directly.  Rather, the applicants in *Microsoft* merely characterized the common specification as requiring that "sending," "transmitting," or "receiving" must occur over a telephone line.  The *Microsoft* majority, therefore, was required to *infer* that such a characterization of the common *specification* was tantamount to a construction of the common disputed *claims*.  Here, however, no such inference in necessary because here, unlike in *Microsoft*, the applicants expressly defined the common claim term *itself*.  If the prosecution statements in *Microsoft* were deemed relevant to the construction of the common terms "sending," "transmitting," or "receiving," then *a fortiori* the prosecution statements at issue here should have been relevant to the construction of the common term "remote locations."  Because of the unusual clarity of those statements, they should be dispositive of the claim construction question—provided, of course, that the remaining evidence of record does not compel a contrary conclusion.

## II.     THE PROSECUTION HISTORY OF THE '720 PATENT IS CONSISTENT WITH ALL OTHER EVIDENCE OF RECORD.

Where, as here, an applicant expressly defines a claim term during the prosecution of a contemporaneous or ancestral patent, that definition is dispositive and trumps all other tools of claim construction.  The rule follows from the premise that a patentee may act as his own lexicographer, and, when he does, "the inventor's lexicography *controls*."  *Phillips*,

- 17 -

2005 WL 1620331 at *8 (emphasis added).  This rule applies whether the inventor's lexicography appears in the patent's specification, *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001), or in its prosecution history, *Southwall Tech., v. Cardinal IG Co.*, 54 F.3d 1570, 1575-76 (Fed. Cir. 1995).  Examples in the case law are numerous.[9]

Here, the prosecution statements of applicants Yurt and Browne are clear and unambiguous acts of lexicography, and would control the question of claim construction were they uttered during the earlier prosecution of the '992 patent.  Because they were not, however, they are to be weighed—like all evidence—against any contrary evidence of record.  But an examination of the remaining evidence of record—the claims, the common specification, and the contemporaneous prosecution history of the `992 patent itself—independently compels the same conclusion—*i.e.*, that the term "remote locations" means and always meant locations "remote from the requesting site."

## A.  The Claim Language

Claim 41 of the '992 patent does not expressly identify any place from which a location is said to be remote, and thus the claim language itself is at best neutral and at worst ambiguous.  This Court, however, concluded otherwise and found that the claim's recitation of a "transmission system" was tantamount to the identification of a place from which a loca-

---

[9] *See, e.g.*, *Seachange*, *supra* (construing term "network for data communications" to require direct, point-to-point, two-way interconnections between processor systems based on prosecution statements, and overcoming even presumption of claim differentiation); *Chimie v. PPG Indus.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (affirming construction based on prosecution statements, and stating that "[s]uch a use of the prosecution history ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers"); *Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 956-57 (Fed. Cir. 2000) (construing "groove" to have a particular width, and stating that "[t]he prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention"); *Biovail Corp. Int'l v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1302 (Fed. Cir. 2001) (construing the term "admixture" based on prosecution statements in a related application, and stating that "[c]laim language . . . must be read consistently with the totality of the patent's applicable prosecution history").

- 18 -

tion is remote.  (Ex F, p. 4.)  But that conclusion, respectfully, does not necessarily follow. For example, a claim might recite a "postal system" that sends packages to "remote locations," but that does not necessarily mean that the place from which a location is "remote" is the "postal system" itself—even though the "postal system" is the only structure *expressly* recited in the claim that arguably could supply this geographic reference point.

Admittedly, difficulty arises here because the language of claim 41 does not expressly recite a "user."  But a similar defect affected the ancestral claim in *Microsoft*, too, which "ma[de] no reference to a telephone line and standing alone d[id] not exclude data transmission over a packet-switched network" like the Internet.  357 F.3d at 1347.  The majority in *Microsoft,* however, construed the terms "sending, "transmitting" and "receiving" to require both of these additional limitations based on the evidence of record—the subsequent prosecution history and the common specification.  Here, as discussed *supra*, the subsequent prosecution history plainly compels defendants' proposed construction.  And as discussed *infra,* so does the common specification and the contemporaneous prosecution history of the `992 patent itself.

## B.      The Common Specification

The common specification consistently describes *the* invention—not merely a preferred embodiment thereof—as a transmission and receiving system that enables, for the first time, a user (1) to request and receive information at different respective locations and (2) to choose among several locations to receive such requested information.  Of course, the claims do not recite that a "remote location" is "selectable" in *all* instances.  But in *all* instances—whether selectable or not—a "remote location" means a site that may be remote from where the user is requesting the information.

The Background of the Invention describes the disadvantages of known prior art systems, such as, for example, conventional cable television video-on-demand systems.  One such disadvantage is that they do not permit a user to "view" information at a location that is

- 19 -

different from where the user "ordered" or requested the information:

> Several designs have been developed which provide the viewer with more convenient means of accessing material [than video cassette rental or purchase]. One such design is disclosed in U.S. Pat. No. 4,506,387, issued to Walter. The Walter patent discloses a fully dedicated, multi-conductor, optical cable system that is wired to the viewer's premises. While the system affords the viewer some control over accessing the material, it requires that a location designated by the viewer by wired with a dedicated cable. The Walter system further requires the viewer be *at that location for both ordering and viewing* the audio/video material.

(Col. 1, lns. 18-29 (emphasis added).)[10]   Walter's system, therefore, is wanting because a user must be physically present at the *same* location for both requesting and receiving information.[11]

The Background of the Invention lists several objects or purposes of *the* invention— again, not merely an embodiment thereof. One of those objects or purposes is "to provide a picture and sound transmission system which allows the user *to remotely select* audio/video material *from any location* that has either telephone service or a computer." (Col. 1, lns. 62-66 (emphasis added).) This object is not described as an advantage of a specific embodiment of the invention. Rather, it is described as an essential attribute of *the invention itself*, and is stated as a specific ground for why *the* invention is novel and deserving of patent protection in the first place. Statements in a specification describing *the* invention—not merely *an* embodiment thereof—are given special weight by construing courts. As the majority explained in *Microsoft*: "When the specification 'makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.'"   357 F.3d at 1347 (quoting

---

[10] Unless separately noted, all citations to the common specification are from the '992 patent.

[11] U.S. Pat. No. 4,506,387 to Walter is provided as Exhibit I.

- 20 -

Case No. C 05-01114 JW (HRL)                    DEFENDANTS' MOTION FOR RECONSIDERATION OF
MDL NO. 1665                                     THE CONSTRUCTION OF THE TERM "REMOTE LOCATIONS"

*SciMed*, 242 F.3d at 1341).[12] Here, the specification "makes clear that the invention does not include" limiting a user to ordering and receiving information at the *same* location, and thus "that feature is deemed outside the reach of the claims," even though "the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Id.*

This Court discounted these statements in the common specification on two grounds, neither of which is applicable here. First, the Court identified more than one preferred embodiment where a user is not, at least in the Court's view, expressly able to "select" between and among remote locations. (Ex. F, p. 5.) But that observation, even if true, is inapplicable because the present construction—*i.e.*, locations "remote from the requesting site"—does not require that such locations be "selectable." Second, the Court concluded that a specification must recite a "clear and unmistakable disavowal" of the "ordinary" meaning of claims before it can affect a claim's scope, relying on *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), and its progeny. (Ex. F, p. 5.) But the rubric of *Texas Digital* and its progeny is inapplicable because it has been all but overruled by the recent *en banc* Federal Circuit decision in *Phillips*, *supra*, which soundly criticized *Texas Digital* for creating the

---

[12] *See also Scimed* 242 F.3d at 1342 (relying in part on Summary of the Invention to limit claimed dual catheter to co-axial, annular tubes); *Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1356-57 (Fed. Cir. 1999) (relying on distinctions over the prior art in the Background and Summary of the Invention to limit "ink delivery means" to "an ink sprayhead having a second, high pressure air source"); *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1090-92 (Fed. Cir. 1998) (relying on a distinction over the prior art repeatedly emphasized in the Summary of the Invention to establish that the patentee's "concentric spring assembly is characterized by its ability to . . . perform[] a back-up function"); *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998) (holding that specification distinguished prior art as inferior and touted advantages of a conical shaped cup for use in an artificial hip device, and stating that "[s]uch statements make clear that the '589 patent discloses only conical shaped cups and nothing further"); *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("since, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection"); *Modine Mfg. Co. v. ITC*, 93 F.3d 766, 770 (Fed. Cir. 1996) (where a patent describes a particular structure as "the invention"—rather than simply one embodiment thereof—the claims are limited to that structure); *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1222 (Fed. Cir. 1996) (relying on the specification to exclude structures with a separate locking screw from the meaning of "body attaching means").

- 21 -

problem of systematic overbreadth in patent claims:

> The problem is that if the district court . . . fails to fully appreci-
> ate how the specification *implicitly* limits [the dictionary] defini-
> tion [of claims], the error will systematically cause the construc-
> tion of the claim to be unduly expansive.  The risk of systematic
> overbreadth is greatly reduced if the court instead focuses at the
> outset on how the patentee used the claim term in the claims,
> *specification, and prosecution history*, rather than starting with a
> broad definition and whittling it down.

2005 WL 1620331 at *14 (emphasis added).

Under the circumstances, the common specification hardly refutes, but rather inde-
pendently compels, the same construction of the term "remote locations" urged by applicants
Yurt and Browne during the prosecution of the '720 patent.

## C.    The Prosecution History of the '992 Patent

The prosecution history of the '992 patent also leads to the same result.  On June 21,
1991, before any action had been taken by the examiner, applicants Yurt and Browne filed a
Petition to Make Special, which required the applicants to, among other things, provide the
examiner with "a detailed discussion of the [prior art] references, which points out . . . how
the claimed subject matter is distinguishable over the references."  MPEP § 708.02 (VIII)
(5th ed., 13th rev., 1989).  In so doing, the applicants again distinguished the cable television
video-on-demand system of Walter as limiting users to ordering and viewing information at
the same location:

> Walter, also discussed in the Background of Invention section of
> the specification, discloses a fully dedicated, multi-conductor,
> optical cable system that is wired to the viewer's premises.  Al-
> though the system affords the viewer some control over access-
> ing the material, it requires that a location designated by the
> viewer be wired with a dedicated cable. The Walter system fur-
> ther requires the viewer be at that location for both ordering and
> viewing the audio/video material.

(Ex. J-1, p. DTV/AMT 001241 (emphasis added).)  Once again, these remarks hardly refute,
but rather independently compel, the same construction of the term "remote locations" urged

- 22 -

by applicants Yurt and Browne during the prosecution of the '720 patent.

The Court, however, discounted these statements (again, in the context of a different proposed construction) on the ground that the "prior art was overcome for more than one reason, creating no clear disavowal of claim scope." (Ex. F, p.p. 6-7).[13] But arguments that distinguish application claims from the prior art on multiple grounds often create separate and independent restrictions on claim scope, as the Federal Circuit recently made clear in the *Seachange* decision.

In *Seachange*, the Federal Circuit reversed a district court's construction of the term "network for data communications" based on one of two distinctions made during prosecution to overcome the prior art. The patent-in-suit related to a method and apparatus for redundantly storing video data for video-on-demand systems. The defendant argued that the prosecution history distinguished the prior art as failing to disclose direct, point-to-point, two-way interconnections between processor systems, and thus the claims should not be construed more broadly. But the plaintiff noted that the prosecution history distinguished the prior art on two grounds—(1) point-to-point connections and (2) redundant storage—and thus neither ground, standing alone, could create a separate disavowal of claim scope, especially where the examiner's notice of allowance relied exclusively on the second distinction and never mentioned the first. The Federal Circuit disagreed, and explained its holding in terms that apply with equal force here:

> [Plaintiff] argues that the applicant made *two* arguments to overcome [the prior art] . . . . [Plaintiff] buttresses this argument by citing the notice of allowance in which the Examiner allowed all claims based only on the "redundant storage" feature. . . . Nothing in the prosecution history suggests that the point-to-point argument did not apply to all of the grouped claims. Applicant did

_____

[13] The Court specifically referred to arguments made to distinguish the application claims over a reference named Golden on the ground that Golden did not disclose the ability to store information for play-back at any time selected by the user. (Ex. F, p. 6.) Ironically, that feature is nowhere recited in claims 1 and 41 of the '992 patent, and thus could not have been a basis for distinguishing those claims from the prior art.

- 23 -

not indicate that the "point-to-point" argument applied only to claim 1. Instead, the natural reading of Applicant's statements suggests that the "point-to-point" argument applied to each claim in the grouping.

2005 WL 1523382 at *9 (emphasis added). *See also Southwall*, 54 F.3d at 1573 (where prior art was distinguished on two bases not disclosed in the art, each basis created a separate estoppel); *Desper Prods.*, 157 F.3d at 1340 ("Any argument made regarding the need to distinguish the prior art . . . does create a separate estoppel, regardless of other distinctions made") (internal quotation marks omitted); *Digital Biometrics v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998) ("While it is true that the applicants went on to specifically distinguish each claim . . . from [the prior art] on more narrower grounds, that does not eliminate global comments made to distinguish the applicants' 'claimed invention' from the prior art").

The same result should follow here. As in *Seachange*, the applicants distinguished the prior art on more than one ground. As in *Seachange*, the question is whether one of those grounds, standing alone, can affect claim scope. Unlike in *Seachange*, there is no evidence here that the examiner relied on an alternate ground more than the ground cited by defendants. Here, as in *Seachange*, *each* ground cited to overcome the prior art creates a *separate* limitation on claim scope. And here, as in *Seachange*, any contrary construction would do violence to the public notice function of the patent system. 2005 WL 1523382 at * 8 ("The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention").

\* \* \*

All of the evidence of record admits of only one conclusion—the term "remote locations" means positions or sites distant in space "from the requesting site." Applicants Yurt and Browne expressly said so during the prosecution of the '720 patent, said so in the com-

mon specification, and said so during the prosecution of the '992 patent of which claim 41 is a part. No view of the public notice function of the patent system—no matter how constrained—could possibly justify a construction of the term "remote locations" that omits this critical feature of the invention. *See Microsoft*, 357 F.3d at 1350 ("We take the patentee at his word and will not construe the scope of the . . . patent more broadly than the patentee itself clearly envisioned").

## CONCLUSION

For the foregoing reasons, the Court should reconsider its prior construction of the term "remote locations" and construe that term to mean "positions or sites distant in space from the requesting location."

DATED:    July 29, 2005

BRADFORD P. LYERLA (*pro hac vice*)
KEVIN D. HOGG (*pro hac vice*)
JEFFREY H. DEAN (*pro hac vice*)
GREGORY G. STANTON (*pro hac vice*)
ANDREW D. RAYMOND (*pro hac vice*)
MARSHALL, GERSTEIN & BORUN LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, Illinois 60606-6357


By:    /s/  Jeffrey H. Dean
            Jeffrey H. Dean

COUNSEL FOR DEFENDANTS ARMSTRONG GROUP, ARVIG COMMUNICATIONS SYSTEMS, BLOCK COMMUNICATIONS, INC., CANNON VALLEY COMMUNICATIONS, INC., CHARTER COMMUNICATIONS, INC., EAST CLEVELAND CABLE TV AND COMMUNICATIONS LLC, LORETEL CABLEVISION, MASSILLON CABLE TV INC., MID-CONTINENT MEDIA, INC., NPG CABLE, INC., SJOBERG'S CABLEVISION, INC., US CABLE HOLDINGS LP, AND WIDE OPEN WEST LLC

- 25 -